<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MCDONALD JOSEPH,<br><br>                    Plaintiff,<br><br>v.<br><br>NEW JERSEY TRANSIT RAIL<br>OPERATIONS, INC., et al.<br><br>                    Defendants. | Civil Action No. 12-1600 (JLL)<br><br><br>**OPINION** |

**LINARES,** District Judge.

This matter comes before the Court by way of a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. The motion was filed by Defendants New Jersey Transit Rail Operations, Inc. and N.J. Transit, Inc. (collectively, "N.J. Transit"); and Paul DeCola ("DeCola"), Leland Parsons ("Parsons"), and William Tidd ("Tidd") (collectively, the "Individual Defendants"). The Court has considered the submissions made in support of and in opposition to Defendants' motion, and considers this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, Defendants' motion is GRANTED.

## I.    FACTUAL BACKGROUND

This action arises out of Defendants' allegedly wrongful termination of Plaintiff's employment with N.J. Transit. Specifically, Plaintiff claims that his employment was terminated because (1) he complained about racial discrimination; (2) he raised certain safety concerns to the Federal Railroad Administration ("FRA"); and (3) he is black.

1

A.      Plaintiff's Employment History With N.J. Transit

Plaintiff was hired by N.J. Transit as a Trackman in July 2006. (Def. Statement of Undisputed Material Facts ("SUMF") at ¶ 1.) Plaintiff's duties included digging, moving ties, moving rail, and other miscellaneous duties as assigned by his supervisors. (*Id.* at ¶ 2.) Plaintiff was promoted to Class II Operator in June 2009, and then Class I Operator in April 2010. (*Id.* at ¶ 3.) In both of these positions, Plaintiff operated machines that built and/or repaired N.J. Transit's rail lines. (*Id.* at ¶ 4.) Plaintiff's promotion to Class I Operator permitted him to operate larger machines. (*Id.* at ¶ 5.)

B.      N.J. Transit's Rail Division

N.J. Transit's Rail Division has three crews, colloquially known as "gangs" – the tie gang, the rail gang, and the surfacing gang. (*Id.* at ¶ 6.) For most of his tenure at N.J. Transit, Plaintiff was a per diem employee, meaning that he could be assigned to any location. (*Id.* at ¶ 7.) Therefore, Plaintiff worked on many different gangs in many different locations. (*Id.* at ¶ 8.) Depending on the assignment and location, there could be anywhere from five to thirty people working on a gang. (*Id.* at ¶ 9.)

C.      The Collective Bargaining Agreement

Plaintiff belonged to a union which has a Collective Bargaining Agreement ("CBA") with N.J. Transit. (*Id.* at ¶ 10.) The CBA sets forth a system by which employees can either 'bid' or 'bump' to get assigned to a particular job and/or machine. (*Id.* at ¶ 11.)

The title of "Class I Operator" or "Class II Operator" does not automatically entitle an employee to operate every machine within that class. (*Id.* at ¶ 12.) Rather, there is a qualification process for each machine. (*Id.* at ¶ 13.)

2

If an employee bids on a machine on which he is not already qualified, he spends a month with a qualified operator who shows him how to operate the machine. (*Id.* at ¶ 14.) After that month, the employee is tested by one of N.J. Transit's Work Equipment Supervisors, and the Work Equipment Supervisor then determines if the employee is sufficiently knowledgeable to be qualified on the machine. (*Id.* at ¶ 15.) If the employee passes the test, the machine is added to his qualification card, which lists all of the machines that the employee is qualified to operate. (*Id.* at ¶ 16.) Additionally, employees can learn machines voluntarily during any down time they may have, or a supervisor could offer training on a machine for which there is a need for an operator. (*Id.* at ¶ 17.)

An employee can also be "bumped" (or displaced) by someone with more seniority, which means that the employee will have to make a new bid or bump a junior employee. (*Id.* at ¶ 18.) If an employee is bumped out of a position for operating a particular machine, and he knows how to operate the machine, he can make a request in writing indicating that he wants to prove his proficiency to qualify for that machine. (*Id.* at ¶ 19.) If the employee shows that he can qualify on the machine, he can make a "bump." (*Id.*)

D.    Plaintiff's Job Duties

Plaintiff's regular work hours were from 7:30 a.m. to 4:30 p.m. (*Id.* at ¶ 21.) Each day he would arrive at work, Plaintiff would attend a morning briefing. (*Id.* at ¶ 22.) After the briefing, Plaintiff would inspect the machine he was operating that day and complete a form titled "Operators Inspection Report." (*Id.* at ¶ 23.)

Plaintiff was taught to do the inspection by the person who trained him on a particular machine. (*Id.* at ¶ 24.) The process for completing the "Operators Inspection Report" required Plaintiff to inspect the machine, note anything that was missing, and note any work that needed

3

to be done to the machine. (*Id.* at ¶ 25.) Plaintiff was expected to report any and all problems with the machine he was to operate on any particular day. (*Id.* at ¶ 26.)

The "Operators Inspection Reports" were submitted to the supervisor or the foreman once a week, and then forwarded to the repairmen in the Maintenance Department. (*Id.* at ¶ 28.) It would then become the mechanics' job to perform any necessary repairs. (*Id.* at ¶ 29.)

The mechanics work in a separate department headed by Jack Morrone ("Morrone"), Supervisor of Work Equipment. (*Id.* at ¶ 31.) Plaintiff never worked as a mechanic in Morrone's department. (*Id.* at ¶ 33.)

E.    Plaintiff's Complaints Regarding the BR-400 Machine

One of the machines that N.J. Transit operators use is the BR-400, which fixes damaged tracks by pushing rocks and gravel into those tracks. (*Id.* ¶¶ 34-35.) Plaintiff began working with the BR-400 machine sometime in early 2009, and operated it periodically between 2009 and July 2010. (*Id.* at ¶ 36.)

Plaintiff felt there were several problems with the BR-400, but of these, the brakes were his primary concern. (*Id.* ¶ 41.) Plaintiff claims that he began raising these concerns when he first bid the BR-400 in early 2009. (*Id.* at ¶ 42.) Specifically, Plaintiff noted his concerns in writing on his "Operations Inspection Report," and verbally to both his supervisor, Domingo Gotay ("Gotay"), and gang foreman, Frank Attardi ("Attardi"). (*Id.* at ¶ 43.) Gotay responded that he would address the issue, and informed Morrone of Plaintiff's complaints regarding the BR-400. (*Id.* at ¶ 44.)

Morrone inspected the machine and found nothing wrong with it. (*Id.* at ¶ 46.) Plaintiff then also expressed concerns regarding the brakes on the DB201, a machine with brakes similar to those on the BR-400. (*Id.* at ¶ 47.) Morrone conducted a demonstration for Plaintiff in which

4

he had a repairman drive the DB201 and slam the brakes as a means of addressing Plaintiff's concerns. (*Id.* at ¶¶ 48-49.) According to Morrone, the issue was not with the brakes themselves, but with the pressure that Plaintiff was applying to the brakes. (*Id.* at ¶ 50.)

Prior to July 19, 2010, Plaintiff's only written complaints regarding the BR-400 were his "Operators Inspection Reports." (*Id.* at ¶ 51.) "Operators Inspection Reports" were typically kept in the machine for seven days and then discarded. (*Id.* at ¶ 53.) Plaintiff claims that he maintained some personal copies of his "Operators Inspection Reports." (*Id.* at ¶ 54.)

During the discovery phase of this case, Plaintiff produced two batches of "Operators Inspection Reports." One batch of reports are for dates ranging from August 11, 2009 to October 24, 2009; a second batch are for dates ranging from April 30, 2010 to May 7, 2010. (*Id.* at ¶¶ 55-56.) Plaintiff did not complete the reports within each of these batches personally, and he does not know who did. (*Id.* at ¶ 57.) Further, Plaintiff was not working on the BR-400 during these time periods, and states that he grabbed the reports for these time periods by mistake. (*Id.* at 58.)

Plaintiff's production omits an "Operators Inspection Report" from June 4, 2010, indicating that the brake shoes were adjusted, and additional 2010 reports from June 10, June 21, July 6, July 15, July 27, August 4, August 12, August 24, September 7, September 22, October 4, October 13, October 25, and November 4, which all indicate that the brakes on the BR-400 were satisfactory. (*Id.* at ¶ 61.)

F.     Incident of July 19, 2010

On July 19, 2010, Plaintiff was working with the surfacing gang under the supervision of Gotay. (*Id.* at ¶ 62.) The regular operator of the BR-400 was absent that day. (*Id.* at ¶ 63.) After the morning briefing, gang foreman Attardi walked over to Plaintiff and requested that he run the BR-400. (*Id.* at ¶ 64.) Plaintiff shook his head to indicate that he would not run it. (*Id.*

5

at ¶ 65.)  Thereafter, Attardi informed Gotay that Plaintiff did not want to run the machine.  (*Id.* at ¶ 66.)

Gotay then approached Plaintiff and asked if he would run the machine; Plaintiff said, "no."  (*Id.* at ¶ 67.)  Gotay then informed Plaintiff that he would have to put him out of service.  (*Id.* at ¶ 68.)

As Plaintiff started to walk away, Gotay called him back and said that Supervisor Bob Cole ("Cole") was on the phone and wanted to know if Plaintiff would run the machine.  (*Id.* at ¶ 69.)  Plaintiff again said, "no," after which point Gotay informed Plaintiff that Cole had decided to put him out of service, and advised that he contact his union and go home.  (*Id.* at ¶ 70.)

The directive to place Plaintiff out of service ultimately came from Bill Tidd ("Tidd"), the Director of Rail Infrastructure and Inspection.  (*Id.* at ¶ 71.)  Plaintiff signed a waiver acknowledging that he was "guilty as charged" of violating N.J. Transit policy, and agreeing to accept the time out of service as discipline.  (*See* Lichtenstein Cert., Ex. K.)

Plaintiff does not recall the last date on which he operated the BR-400 prior to July 19, 2010, and admitted that it could have been weeks or months.  (Def. SUMF at ¶¶ 75-76.)  In spite of Plaintiff's concerns about the BR-400, he had never previously refused to operate the machine.  (*Id.* at ¶ 77.)  Additionally, Plaintiff admitted that on July 19, 2010, he did not explain to Attardi or Gotay why he did not want to operate the BR-400.  (*Id.* at ¶ 78.)

Of note, N.J. Transit has a procedure by which an employee may object to operating a machine either verbally or through a "Challenge Form."  (*Id.* at ¶ 79.)  The "Challenge Form" is a means of protecting employees if they have safety concerns about operating a particular machine.  If an employee completes a "Challenge Form," he does not have to operate the machine until the issue he has raised is resolved.  (*Id.* at ¶ 80.)

6

If Plaintiff had explained that he did not want to operate the BR-400 because he thought it was unsafe, that would have constituted a verbal challenge, and Tidd would have ensured that it was investigated. (*Id.* at ¶ 82.)

DeCola, a Track Supervisor, and his supervisor, Parsons, were not involved in the July 2010 incident in any way. (*Id.* at ¶ 83.) Additionally, DeCola never supervised Plaintiff when the BR-400 was Plaintiff's bid, and did not begin regularly supervising Plaintiff until October 2010. (*Id.* at ¶ 84.) DeCola became aware of the July 2010 incident only when Plaintiff mentioned that he had issues with the machine, and had been taken out of service. (*Id.* at ¶¶ 85-86.) Even after DeCola had become aware, his knowledge about this incident was limited because he and Plaintiff never discussed it in detail. (*Id.* at ¶ 87.)

G.   Plaintiff's Complaint to the FRA Regarding his Safety Concerns about the BR-400

At some point before November 2010, Plaintiff reported his safety concerns about the BR-400 to the FRA, and spoke to Ronald Marx ("Marx"), an FRA investigator. (*Id.* at ¶¶ 88-89, 92.) Specifically, Plaintiff told Marx that the brakes on the BR-400 were bad. (*Id.* at ¶ 90.) Marx asked Plaintiff to email him photographs of the machine. (*Id.* at ¶ 91.) Plaintiff sent Marx the requested photographs, which Plaintiff took with his personal camera. (*Id.* at ¶ 94.)

Some time after July 19, 2010, Plaintiff saw Marx at his worksite. (*Id.* at ¶ 95.) When Plaintiff saw Marx, he was near the BR-400. (*Id.* at ¶ 96.) Marx asked Plaintiff if the BR-400 was the same machine about which he had complained. (*Id.*) After Plaintiff indicated that it was, Marx inspected the machine. (*Id.* at ¶ 97.) Thereafter, Marx issued an Inspection Report with respect to the BR-400 and several other machines. (*Id.* at ¶ 98.) Marx's report indicated a few items for repair, but none serious enough to qualify for a violation. (*Id.* at ¶ 99.) Specifically, the only recommended repairs for the BR-400 concerned the ladder/steps and the

windshield.  (*Id.* at ¶ 100.)  N.J. Transit did not receive any citations or fines as a result of Marx's inspection.  (*Id.* at ¶ 101.)

Plaintiff never informed Tidd, Parsons or DeCola that he had complained to the FRA. (*Id.* at ¶ 105.)  Moreover, neither Tidd, Parsons, nor DeCola ever informed Plaintiff that they were aware of his complaint to the FRA.  (*Id.* ¶ 108.)

Parsons became aware of Plaintiff's complaint to the FRA sometime after Marx inspected the BR-400.  (*Id.* at 109.)  Tidd and DeCola became aware of Plaintiff's FRA complaint only after Plaintiff filed the instant action.  (*Id.* at ¶¶ 110-11.)  None of Plaintiff's supervisors ever threatened Plaintiff with any adverse consequences if he complained to the FRA.  (*Id.* at ¶ 112.)

H.      Events Leading to the Termination of Plaintiff's Employment

In March 2011, Plaintiff was bumped into a "casual driver" position by an employee with more seniority.  (*Id.* at ¶ 113.)  As a result, Plaintiff went to N.J. Transit's Assignment Office on March 11, 2011, to make a new bid or bump himself.  (*Id.* at ¶ 114.)  Plaintiff reviewed the available positions, and chose to bump Anthony Villanova off of the 801 machine.  (*Id.* at 115.)

The 801 machine, known as a "stabilizer," is a very large machine that vibrates on the track and permits trains to pass over the track at a normal speed following construction work. (*Id.* at ¶ 116.)

On March 14, 2011, Plaintiff arrived at work and informed his supervisors that he had bumped the 801 machine.  (*Id.* at ¶ 117.)  Plaintiff's understanding was that the bump should be permitted because he had more seniority than the person bumped, he was a Class I Operator, and he had some previous knowledge about the 801 machine.  (*Id.* at ¶ 118.)

Plaintiff's previous knowledge about the 801 machine included moving the 801 machine when he was on the "surfacing gang" supervised by Gotay.  (*Id.* at ¶ 119.)  Plaintiff, however,

had never operated the 801 machine on the track. (*Id.* at ¶ 120.) Therefore, when he arrived at work on March 14, Plaintiff asked Parsons if there was a qualified operator available to go over the 801 machine with him. (*Id.* at ¶ 121.) Plaintiff also asked other operators—specifically, Wayne Rasavage, Bruce Teuber ("Teuber") and Lawrence Graziano ("Graziano")—to advise him on the operation of the 801 machine. (*Id.* at ¶ 122.) Teuber and Graziano, who were both qualified operators of the 801 machine, then went over the machine with Plaintiff. (*Id.* at ¶ 123.)

Subsequently, foreman Dan Dooley told Plaintiff that he would have to bid another machine. (*Id.* at ¶ 124.) Plaintiff protested, and Dooley told him to call Tidd. (*Id.* at ¶ 125.)

Later that day, Tidd told Plaintiff that he could submit a written request to show proficiency on the 801 machine and provide it to Morrone. (*Id.* at 126.) Plaintiff submitted the request. (*Id.* at ¶ 127.) Morrone then tested Plaintiff, and found him to be proficient on the 801 machine. (*Id.*) Based on Plaintiff's preliminary showing of proficiency, Tidd permitted the bump to stand. (*Id.* at ¶ 129.)

However, before Morrone qualified Plaintiff on the 801 machine, he needed to see Plaintiff operate the machine on the track; this ultimately never happened. (*Id.* at ¶ 128.) Although Plaintiff could not recall whether Tidd reserved the right to rescind the bump based upon Plaintiff's performance on the track, he does recall that Tidd explained that permitting the bump was a safety issue, and that he had to be sure that Plaintiff knew how to run the 801 machine. (*Id.* at ¶¶ 130-31.) If Plaintiff could not demonstrate that he knew how to run the 801 machine, Tidd intended to rescind the bid. (*Id.* at ¶ 132.)

The next morning, Plaintiff was inside the 801 machine when Tidd appeared at the job site. (*Id.* at ¶ 133.) Tidd approached Plaintiff and told him that he could not authorize the bump.

(*Id.* at ¶ 134.)  Tidd had learned that Plaintiff had asked other operators to show him how to operate the machine, and became concerned about Plaintiff's ability.  (*Id.* at ¶ 135.)

Plaintiff asked why the bump could not be authorized since he had been previously told that the bump could stand.  (*Id.* at ¶ 136.)  Tidd explained that there was a safety concern because it was unclear whether Plaintiff knew how to operate the 801 machine.  (*Id.* at ¶ 137.)  When Plaintiff expressed confusion, he alleges that Tidd told him, "I don't know what's wrong with you people," and then said, "show me what you know.  Just show me what you know."  (*Id.* at ¶ 138, citing Lichtenstein Cert., Ex. B at 117:5-15.)

While this conversation was taking place, Morrone was present inside the 801 machine.  (*Id.* at ¶ 139.)  Plaintiff then proceeded to demonstrate what he knew about the machine, and Morrone confirmed to Tidd that Plaintiff was performing the functions correctly.  (*Id.*)

After the demonstration, Tidd permitted the bump to stand (with final approval still pending Plaintiff's operation of the 801 machine on the track).  (*Id.* at ¶ 140.)  Tidd then informed Villanova that he would have to bid another job.  (*Id.* at ¶ 141.)

Plaintiff later spoke to DeCola, and asked, "What's going on?  Is it because I'm black?"  (*Id.* at ¶ 146.)  Plaintiff asked DeCola this question because he believed that Tidd's reference to "you people" was racially discriminatory.  (*Id.* at ¶ 142.)  DeCola allegedly "shrugged" the question "off," and had no response.  (*Id.* at ¶ 147, citing Lichtenstein Cert., Ex. B at 114:16-23.)

When Plaintiff arrived to work on March 17, 2011, he was told that he would have a qualified operator (i.e., Teuber) with him on the 801 machine that day.  (*Id.* at ¶ 149.)  Plaintiff then prepared the 801 machine, and moved it onto the siding track.  (*Id.* at ¶ 150.)  Plaintiff asked DeCola if he was picking up Teuber before going out on the main track.  (*Id.* at ¶ 151.)  DeCola, who thought that Teuber was already in the 801 machine, told Plaintiff to wait while he called

Parsons. (*Id.* at ¶¶ 152-53.)  Plaintiff then allegedly asked DeCola if he could call his union, and DeCola agreed. (*Id.* at ¶ 154.)

Subsequently, Plaintiff exited the 801 machine and walked approximately ten feet to call his union representative on his cell phone. (*Id.* at ¶ 155.)  According to Plaintiff, he is certain that he put the 801 machine in "park" before exiting, and saw DeCola enter and exit the machine while he was on the phone. (*Id.* at ¶¶ 156-57.)  Later, DeCola yelled that the 801 machine was moving, although Plaintiff claims that he did not see the machine move at all. (*Id.* at ¶¶ 160-61.) Plaintiff then returned to the machine, and allegedly noticed that the levers had been tampered with because the brake was off and the lever that had been in neutral was now in first gear. (*Id.* at ¶¶ 164-65.)

Following this incident, DeCola asked Plaintiff to provide a statement regarding what had just occurred. (*Id.* at ¶ 166.)  Plaintiff told DeCola that he saw him go into the machine, and DeCola responded, "you're crazy.  You didn't see me go into the machine." (*Id.* at ¶ 167, citing Lichtenstein Cert., Ex. B at 126:7-20.)

Shortly thereafter, Parsons arrived on the scene while Plaintiff was on the phone with Herman Bullock ("Bullock"), a union representative. (*Id.* at ¶ 169.)  Plaintiff approached Parsons while still on the phone with Bullock. (*Id.* at ¶ 170.)  Parsons then said that he was not going to have a three-way conversation, and asked Plaintiff to get off the phone and show him what happened. (*Id.* at ¶¶ 170-72.)  Parsons also asked Plaintiff to provide a written statement, which Plaintiff did not provide because he purportedly was feeling ill. (*Id.* at ¶¶ 173-75.)

During their conversation, Plaintiff told Parsons that he wanted to go to Penn Plaza. (*Id.* at ¶ 176.)  Parsons then told Plaintiff that he was going to need to take a urine test, which Plaintiff's union representative assured was standard procedure following this type of incident.

11

(*Id.* at ¶¶ 178-79.)  Parsons drove Plaintiff to the testing facility in his truck.  (*Id.* at ¶ 180.)  Once at the testing facility, Plaintiff allegedly became dizzy and passed out.  (*Id.* at ¶ 184.)  As a result, Plaintiff was taken to a hospital.  (*Id.* at ¶ 185.)

Once at the hospital, Plaintiff was treated for a panic attack and released shortly thereafter.  (*Id.* at ¶ 186.)

I.     Plaintiff's Disciplinary Hearing and Subsequent Termination

Following the March 17, 2010 incident, Plaintiff was taken out of service and charged with several disciplinary violations, including: (1) leaving the 801 machine unattended and allowing it to roll; (2) making an unauthorized call on his personal cell phone; (3) being argumentative and insubordinate toward his supervisors; (4) being dishonest about his previous experience with the 801 machine, and (5) accusing DeCola of releasing the brake of the 801 machine.  (*Id.* at ¶ 187.)

Plaintiff appealed the disciplinary charges, and a two-day hearing was held on May 18 and 19, 2011.  (*Id.* at ¶ 188.)  Plaintiff had union representation at the hearing.  (*Id.* at ¶ 190.)  Ten witnesses testified during the hearing and provided written statements which were introduced as exhibits.  (*Id.* at ¶ 192-93.)  Plaintiff also had the opportunity to give testimony, cross examine witnesses, and provide a closing statement.  (*Id.* at ¶¶ 192-94.)

After the hearing, the transcript and exhibits were sent to Bruce Wigod ("Wigod"), Chief Track Engineer, who made the ultimate decision to terminate Plaintiff's employment.  (*See id.* at ¶ 195; Lichtenstein Cert., Ex. U at 44:24-45:2.)[1]  Wigod decided to terminate Plaintiff's

---

[1] The Collective Bargaining Agreement requires one person within each department to be the person to issue formal discipline; Wigod is that designated person within the Track Department, and was thus the only individual authorized to terminate Plaintiff's employment. (*See* Def. SUMF at ¶ 196.) Plaintiff denies that Wigod made the decision to terminate him, in spite of his admission that Wigod had discretion as to what level of discipline to impose. (*See* Pl. Resp. SUMF at ¶ 207.) Plaintiff relies primarily on Defendants' initial response to Plaintiff's Interrogatory No. 5, in which Defendants identified DeCola, Leland, and Parsons as individuals who "participated" in the decision to terminate Plaintiff, to suggest that there is a genuine question of material fact as whether Wigod

employment because he felt the charges were egregious when considered cumulatively. (*Id.* at ¶ 198.) The factors that played into Wigod's decision included the following: (1) Plaintiff's disciplinary history of insubordination; (2) Plaintiff's refusal to provide a statement of the March 17, 2010 incident; (3) Plaintiff's unauthorized use of a cell phone; (4) Plaintiff's having left the 801 machine unattended; and (5) Plaintiff's having accused DeCola of sabotaging the machine. (*Id.* at ¶ 200.) Wigod acknowledged the confusion surrounding Plaintiff's 801 machine bump, but concluded that this confusion was not mitigating enough when accounting for the totality of the circumstances. (*Id.* at ¶ 204.)

Although no one factor was dispositive, Wigod felt that Plaintiff's most egregious violation was his accusation against DeCola. (*Id.* at ¶ 201.) Wigod had credited DeCola's assertion that he did not sabotage the 801 machine, a credibility determination that was Wigod's prerogative to make. (*Id.* ¶¶ 202-03.)

On June 3, 2011, Plaintiff received notice of his dismissal from all service. (*Id.* at ¶ 206.) The level of discipline imposed was completely within Wigod's discretion. (*Id.* at ¶ 207.) The person who replaced Plaintiff on the 801 machine was Aldo Baroni ("Baroni"), a Hispanic man. (*Id.* at ¶ 208.)

J.    Plaintiff's Allegations of Retaliation and Discrimination

Plaintiff feels that his termination was in retaliation for his having contacted the FRA about the BR-400, and his having expressed concern about race discrimination to DeCola. (*Id.* at ¶¶ 209, 211-12.) Plaintiff has, nevertheless, acknowledged that DeCola has never made any comments to him that he felt were racially discriminatory. (*Id.* at ¶ 214.)

---

was the ultimate decision maker. Plaintiff's reliance on Defendants' initial response to interrogatories is misplaced because the only plausible inference that any reasonable jury may draw from the record is that DeCola, Leland, and Parsons' involvement in the decision to terminate Plaintiff was limited to their participation in the disciplinary hearing. Accordingly, based on the record before it, this Court considers the fact that Wigod was the ultimate decision maker with respect Plaintiff's termination to be undisputed.

In addition to the exchange with Tidd on March 14, 2011, Plaintiff had one other exchange with a N.J. Transit Employee during which he felt discriminated against on account of his race. Specifically, Plaintiff once had a conversation with Parsons during which Plaintiff expressed a concern that people did not like him. (*Id.* at ¶ 216.) Parsons' response was, "well, . . . people don't like you but . . . people don't like me either." (*Id.* at ¶ 217, citing Lichtenstein Cert., Ex. B at 154:8-14.) Plaintiff felt that Parson's comment was racially discriminatory, yet did not complain to anyone. (*Id.* at ¶¶ 220-21.) During his deposition, Parsons acknowledged saying this, and explained that the point he was trying to convey to Plaintiff was that "he had to learn to work with people," regardless of whether they liked him or not. (*Id.* at ¶ 218, citing Lichtenstein Cert., Ex. B at 15-17.)

According to Plaintiff, N.J. Transit desires to have only white people from Pennsylvania operate the 801 machine. (*Id.* at ¶ 223; *see also* Pl. Resp. SUMF at ¶ 223.) Plaintiff bases this belief on his having seen only white people running the 801 machine, and comments from co-workers who have suggested that only white people from Pennsylvania can operate this machine. (*Id.* at ¶ 224.)

As of March 17, 2011, there were three Class I operators in surfacing gang A, one black Class II operator and one black Trackman. (*Id.* at ¶ 232.) The salary of all Class I operators is the same, regardless of the machine operated (with the exception of one specialized machine, the track geometry car). (*Id.* at ¶ 233.) The rate of pay for all employees is established by the CBA.

## II.   PROCEDURAL BACKGROUND

Plaintiff filed his initial complaint on March 13, 2012, and a second amended complaint on November 21, 2012. In his second amended complaint, Plaintiff asserts the following causes of action against all Defendants: (1) race discrimination and retaliation under 42 U.S.C. §§ 1983

14

and 1981; (2) race discrimination and retaliation under the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 et seq.; and (3) retaliatory termination under the Conscientious Employee Protect Act ("CEPA"), N.J.S.A. 34:19-1 et seq.  Additionally, Plaintiff appears to assert an "aiding and abetting" claim against the Individual Defendants under the NJLAD and §§ 1981 and 1983, although such a claim is not specifically pled as a separate cause of action.  Finally, Plaintiff's complaint seeks punitive damages against Defendants.

Defendants filed a motion for summary judgment on August 23, 2013.  Plaintiff filed an opposition brief on September 23, 2013.  In his opposition brief, Plaintiff states that he is withdrawing his CEPA claim against all Defendants, and his § 1983 claim against N.J. Transit. (*See* Def. Oppn. Br. at 4 n.2.)  The Court, therefore, will dismiss these claims with prejudice and will not consider whether summary judgment should be granted as to these claims.

## III.   LEGAL STANDARD

"Summary judgment should be granted only 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Bender v. Twp. of Monroe*, 289 F. Appx. 526, 526-27 (3d Cir. 2008) (quoting Fed. R. Civ. P. 56(c)).  On a summary judgment motion, the moving party must first show that there is no genuine issue of material fact.  *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial. *Id.* at 324.  The non-moving party must offer specific facts that establish a genuine issue of material fact; the non-moving party may not simply rely on unsupported assertions, bare allegations, or speculation. *See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999). The Court must consider all facts presented and the reasonable inferences drawn from them in

the light most favorable to the non-moving party. *See Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

## IV.    DISCUSSION

Determining whether Defendants are entitled to summary judgment requires this Court, as a threshold matter, to decide whether there are sufficient facts in the record from which a reasonable jury may: (1) find that Defendants retaliated against Plaintiff because the latter complained of racial discrimination and (2) find that Defendants terminated Plaintiff's employment because of his race.

### A.    Whether Summary Judgment Should be Granted as to Plaintiff's Retaliation Claims under the NJLAD and §§ 1981 and 1983

The burden-shifting framework the U.S. Supreme Court set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) applies to Plaintiff's retaliation claims under the NJLAD and §§ 1983 and 1981. *See, e.g., Chen v. Newark Pub. Schools*, 2009 U.S. Dist. LEXIS 103746, at *5 n.2 (D.N.J. Nov. 6, 2009) (observing that employment discrimination claims under the NJLAD and §§ 1981 and 1983 are analyzed under the *McDonnell Douglas* burden-shifting framework) (citing *McKenna v. Pacific Rail Service*, 32 F.3d 820, 825 n.3 (3d Cir. 1994)).   Under this framework, Plaintiff bears the initial burden of establishing a prima facie case of retaliation. *See McDonnell Douglas*, 411 U.S. at 802.  If Plaintiff satisfies this burden, the burden then shifts to Defendants to "articulate some legitimate, nondiscriminatory reason" for their action. *Id.* If Defendants articulate a legitimate reason for their action, Plaintiff must then show that Defendants' proffered reasons were merely a pretext for unlawful retaliation. *See id.* at 804-05. To do this, Plaintiff "must point to some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of

the employer's action." *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (applying *McDonnell Douglas* framework in employment discrimination case brought under Title VII).

To establish a prima facie case on his retaliation claims, Plaintiff must establish that: (1) he participated in protected activity; (2) his employer took an adverse employment action after or contemporaneous with the protected activity; and (3) there is a causal link between the protected activity and the employer's adverse action. *See, e.g., Kant v. Seton Hall Univ.*, 289 Fed. Appx. 564, 567 (3d Cir. Aug. 27, 2008) (noting that these are the three elements that a plaintiff must satisfy "[t]o advance a prima facie case of retaliation under section 1981, Title VII, or the NJLAD") (citing *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 286 (3d Cir. 2001)).

The crux of Defendants' arguments in support of summary judgment as to Plaintiff's retaliation claims is that the record fails to suggest either that Plaintiff engaged in protected activity or that there is a causal link between Plaintiff's purportedly protected activity and the termination of his employment.

Plaintiff, on the other hand, argues that he did engage in protected activity by complaining about racial discrimination to DeCola. Plaintiff further argues that the following facts suffice to raise genuine questions of material fact as to whether there is a causal link between his complaint to DeCola and the termination of his employment: (1) the short timespan between his complaint to DeCola and his termination; (2) the fact that Defendants antagonized him by failing to provide a qualified operator for the 801 machine; and (3) Parsons, DeCola, and Tidd—as opposed to Wigod—were the true decision makers with respect to Plaintiff's termination. (*See* Def. Oppn. Br. at 9-14.)

Even if this Court were to assume that Plaintiff's question to DeCola amounted to a

complaint of racial discrimination, it is apparent that the facts to which Plaintiff points are insufficient to raise a triable question as to whether there is a causal link between his purported complaint to DeCola and the termination of his employment.

First, "it is well settled that the close temporal proximity between a protected act and an adverse employment action, alone, is insufficient to raise an inference of retaliation." *Carvalho v. Aircraft Serv. Int'l, Inc.*, 2013 U.S. Dist. LEXIS 145279, at *29-*30 (D.N.J. Oct. 8, 2013) (citations omitted); *see also Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 301 (3d Cir. 1991) ("It is important to emphasize that it is causation, not temporal proximity itself, that is an element of a plaintiff's prima facie case, and temporal proximity *merely provides an evidentiary basis from which an inference can be drawn.*") (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997)).

Plaintiff relies on *Jalil v. Avdel Corp.*, 873 F.2d 701 (3d Cir. 1989) for the proposition that "[t]emporal proximity between the protected activity and the adverse employment action is sufficient to establish a causal link necessary to defeat" a motion for summary judgment. (Def. Oppn. Br. at 12.) In *Jalil*, an employer terminated the plaintiff two days after the plaintiff had filed a complaint of racial discrimination with the Equal Employment Opportunity Commission ("EEOC"). 873 F.2d at 708. The employer's proffered reason for terminating the plaintiff was "gross insubordination" on account of the plaintiff having resisted instructions to remove a radio headset while at work. *Id.* at 703. The Third Circuit held that the plaintiff had demonstrated a causal link between his protected activity of filing the EEOC complaint and his termination "by the circumstance that the discharge followed rapidly, only two days later, upon [the employer's] receipt of [the plaintiff's] EEOC claim," and noted that there were issues of material fact as to whether the employer's proffered reason for terminating the plaintiff was merely pretextual. *Id.*

18

Notably, the Third Circuit based its decision on "[a]n objective review of the evidence" before it, which convinced it that the plaintiff "had called into question the employer's true motivation in discharging him." *Id.* at 708.

Although the Court does not dispute that the timing of an employee's termination may be suggestive of retaliation when accounting for the totality of the facts in the record, the temporal proximity between a protected act and a termination of employment is not, alone, prima facie evidence of retaliation. *See, e.g., Marra*, 497 F.3d at 301; *see also Young v. Hobart West Grp.*, 385 N.J. Super. 448, 467 (App. Div. 2005) ("[T]he mere fact that [an] adverse employment action occurs after [the protected activity] will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two."). This is particularly so in this case, since there was an unprotected intervening act between Plaintiff's purported complaint and his termination, namely, the fact that Plaintiff left the 801 machine unattended when it began rolling without anyone operating it. *See, e.g., Reap v. Cont'l Cas. Co.*, No. 99-1239, 2002 U.S. Dist. LEXIS 13845, at *69 (D.N.J. June 28, 2002) ("Even if a causal connection is assumed, however, intervening unprotected conduct may sever the putative causal connection between protected activity and an adverse action.").[2]

Second, Plaintiff's claim that Defendant "antagonized" him by failing to provide a qualified operator for the 801 machine is insufficient to raise a triable issue of material fact. Notably, Defendants also failed to provide a qualified operator for the 801 machine on the days

---

[2] The Court is mindful that Plaintiff claims that DeCola sabotaged the 801 machine by releasing the brake. During the disciplinary hearing, however, Wigod credited DeCola's assertion that he did not release the brake on the 801 machine over Plaintiff's claim that he did. Plaintiff acknowledges that it was Wigod's right to make credibility determinations. Although Wigod may have been wrong to credit DeCola's version of events over that of Plaintiff's, being a bad judge of credibility does not amount to retaliation. *See, e.g., Hood v. Pfizer, Inc.*, 2009 U.S. App. LEXIS 8062, at *10 (3d Cir. Apr. 16, 2009) ("It may not have been wise, shrewd, prudent or . . . competent for [employer] to credit a co-worker's word over [the plaintiff's], but this merely demonstrates that [the employer] may have been a bad judge of credibility, not that it violated the NJLAD.") (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

preceding his purported complaint. Thus, Defendants' failure to provide Plaintiff with a qualified operator for the 801 machine cannot support an inference of retaliation.

Third, although Parsons, DeCola, and Tidd participated in the disciplinary hearing which resulted in Plaintiff's termination, these individuals did not have actual decision making authority as to what discipline would be imposed. The record reflects that only Wigod had authority to terminate Plaintiff's employment, and in fact made that decision. Further, nothing in the record suggests that Wigod was even aware that Plaintiff had made a complaint of racial discrimination. Thus, it is not apparent to the Court how Wigod's decision to terminate Plaintiff's employment could amount to retaliation.

In light of Plaintiff's failure to establish a causal link between his purported complaint about racial discrimination and his termination, the Court will grant summary judgment as to Plaintiff's retaliation claims.

B.     Race Discrimination Claims under the NJLAD and §§ 1981 and 1983

To establish a prima facie case of race discrimination (i.e., discriminatory discharge) under the NJLAD or §§ 1981 and 1983, Plaintiff must demonstrate: (1) that he is in a protected class; (2) that he is qualified for the position held; (3) that he suffered an adverse employment action; and (4) either that the employer sought similarly qualified persons who are not members of his protected class or that the circumstances surrounding the adverse employment action support an inference of discrimination. *See, e.g., Victor v. State*, 203 N.J. 383, 409 (2010); *Embry v. Fleckenstein*, No. 95-5897, 1996 U.S. Dist. LEXIS 17157, at *23 (E.D. Pa. Nov. 20, 1996) (citing *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 243-54 (1983)); *Hatcher v. Family Dollar Store*, No. 08-1444, 2010 U.S. Dist. LEXIS 29211, at *38 (D.N.J. Mar. 26, 2010) (citation omitted).

Courts employ the *McDonnell Douglas* burden shifting framework in analyzing discriminatory discharge claims. *See, e.g., Photis v. Sears Holding Corp.*, No. 11-6799, 2013 U.S. Dist. LEXIS 104152, at *18 (D.N.J. July 25, 2013) (observing that New Jersey courts apply the *McDonnell Douglas* framework "to assess discriminatory discharge claims under NJLAD") (citations omitted); *see also Carroll v. Tompkins Rubber Co.*, No. 92-6457, 1993 U.S. Dist. LEXIS 7673, at *11 (E.D. Pa. June 8, 1993) (applying *McDonnell Douglas* analysis in § 1981 discriminatory discharge claim).

Here, the parties do not specifically dispute that Plaintiff satisfies the first, second, and third elements of a race discrimination claim. At issue is whether Plaintiff has set forth sufficient facts from which a jury may find that he satisfies the fourth element. In arguing that he has, Plaintiff relies on the fact that he "was replaced by an individual outside of his protected class, Aldo Baroni, who is Hispanic." (Def. Oppn. Br. at 18.) The record also suggests that Plaintiff's race discrimination claim is largely premised on his belief that N.J. Transit wants only white people to operate the 801 machine based on his having seen only white co-workers operating the 801 machine, and comments from co-workers who have suggested that only white people from Pennsylvania can operate this machine. (*See* Def. Resp. SUMF at ¶ 223.)

Plaintiff's beliefs and the speculation of Plaintiff's co-workers are insufficient to raise genuine questions of material fact with respect to Plaintiff's race discrimination claim. *See, e.g., Ridgewood Bd. of Educ.*, 172 F.3d at 252. More importantly, Plaintiff largely relies on the same failed factual arguments he advanced in support of his retaliation claim to sustain his position that his employment was terminated on account of his race, (*see* Def. Oppn. Br. at 18), and has failed to specifically rebut Wigod's articulated legitimate reasons for terminating him.

To survive summary judgment, Plaintiff must set forth sufficient evidence that would

allow a reasonable jury to find that the given reasons for his termination "[were] not the true reason for the employment decision, and that race was." *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993). Nothing in the record suggests that Wigod's decision to terminate Plaintiff's employment was based on race. Accordingly, the Court will grant summary judgment as to Plaintiff's race discrimination claim.

   C.   <u>Aiding and Abetting Claims against the Individual Defendants under the NJLAD and §§ 1981 and 1983</u>

Having determined that Defendants are entitled to summary judgment as to Plaintiff's retaliation and race discrimination claims, the Court could grant Defendants' summary judgment motion without further analysis. For the sake of completeness, however, the Court will address the extent to which summary judgment is appropriate as to any aiding and abetting claim against the Individual Defendants.

In his second amended complaint, Plaintiff asserts that Tidd, Parsons, and DeCola are liable for retaliation and race discrimination because they "jointly terminated Plaintiff for pretextual reasons because of his race and/or complaints of discriminatory treatment in the workplace," and because they "aided and abetted the discriminatory treatment of Plaintiff and participated in the retaliatory termination of Plaintiff." (*See* Second Am. Compl. at ¶¶ 31, 35.) As discussed above, the record does not support Plaintiff's assertion that any of these individuals actually "terminated" Plaintiff. Further, Plaintiff's failure to specifically plead a cause of action for "aiding and abetting" would compel this Court to dismiss any such claim. *See, e.g., White v. Cleary*, No. 09-4324, 2012 U.S. Dist. LEXIS 36694, at *15 (D.N.J. Mar. 19, 2012) (dismissing NJLAD claim for aiding and abetting at the summary judgment stage because plaintiff failed to specifically plead such a claim).

Nevertheless, even if an "aiding and abetting" claim against the Individual Defendants

22

had been properly pled, the Court would still grant summary judgment in Defendants' favor.

As to any aiding and abetting claim brought against the Individual Defendants under the NJLAD, said claim fails because "[i]t is only possible to find an individual liable for aiding and abetting under the [NJLAD] . . . when the employer may be held liable under the [NJLAD]." *See Roman v. Waste Mgmt. of N.J.*, No. 10-4337, 2011 U.S. Dist. LEXIS 50910, at *13 (D.N.J. May 12, 2013) (citations omitted). In this case, Plaintiff's employer is N.J. Transit, not the Individual Defendants. *See, e.g., Cicchetti v. Morris Cnty. Sheriff's Office*, 194 N.J. 563, 594 (2008) ("[W]e have recently held that the plain meaning of the definition of employer in the [NJLAD] does not include a supervisor."). As this Court has determined that summary judgment is appropriate as to Plaintiff's NJLAD race discrimination and retaliation claims against all Defendants, the Individual Defendants cannot—as a matter of law—be liable for aiding and abetting.

Similarly, liability cannot extend to the Individual Defendants on a theory of aiding and abetting N.J. Transit under §§ 1981 and 1983 because N.J. Transit cannot be held liable under either statute. *See, e.g., Failla v. City of Passaic*, 146 F.3d 149, 159 (3d Cir. 1998) (noting that "it is fundamental to aiding and abetting liability that the aider and abettor acted in relation to a principal, here, the employer.").

In relevant part, § 1981 guarantees to "[a]ll persons within the jurisdiction of the United States the . . . same right in every State and Territory . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Subsection (c) of this statute provides that "[t]he rights protected by [§ 1981] are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c).

23

"[B]ecause Congress [did not] explicitly create[] a remedy against state actors under §
1981(c) . . . 'the express cause of action for damages created by § 1983 constitutes the exclusive
federal remedy for violation of the rights guaranteed in § 1981 by state governmental units.'"
*McGovern v. City of Philadelphia*, 554 F.3d 114, 121 (3d Cir. 2009) (quoting *Jett v. Dallas
Independent School Dist.*, 491 U.S. 701, 733 (1989)).

Here, there can be no dispute that N.J. Transit is a state governmental unit. *See, e.g.,
Johnson v. N.J. Transit Rail Operations, Inc.*, No. 87-173, 1988 U.S. Dist. LEXIS 3451, at *5
(D.N.J. Mar. 15, 1988) (observing that "New Jersey Transit is by statute a State instrumentality
performing an essential government function."). Thus, only § 1983 can potentially provide a
federal remedy for N.J. Transit's alleged violations of § 1981. *See McGovern*, 554 F.3d at 121.

To establish liability against N.J. Transit under § 1983, [3] Plaintiff must show that N.J.
Transit is a "person" within the meaning of the statute. *See, e.g., West v. Atkins*, 487 U.S. 42, 48
(1988) ("To state a claim under § 1983, a plaintiff must allege the violation of a right secured by
the Constitution and laws of the United States, and must show that the alleged deprivation was
committed by a *person* acting under color of state law.").

It is well settled that states and extensions thereof are not "persons" within the meaning
of § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). As "an instrumentality of
the State exercising public and essential governmental functions," *see* N.J.S.A. 27:25-4, N.J.
Transit is an "extension of the State of New Jersey." *See Geod Corp. v. N.J. Transit Corp.*, 678
F. Supp. 2d 276, 287-88 (D.N.J. 2009). Accordingly, N.J. Transit is not a person within the
meaning of § 1983, and thus cannot be held liable under this statute. *See Geod*, 678 F. Supp. 2d
at 288 (holding that N.J. Transit "cannot be held liable pursuant to 42 U.S.C. § 1983" because it

---

[3] For the purpose of its analysis, the Court will assume that Plaintiff could pursue his § 1983 claim against N.J.
Transit in spite of his having agreed to withdraw said claim.

is "not a 'person'" within the meaning of that statute); *see also Mancini v. N.J. Tranit Corp*, No. 12-5753, 2013 U.S. Dist. LEXIS 79358, at *5-*6 (D.N.J. June 5, 2013) (dismissing § 1983 claim against N.J. Transit because N.J. Transit is not a 'person' within the meaning of § 1983.).

As N.J. Transit cannot be held liable for race discrimination or retaliation under §§ 1981 or 1983, the Individual Defendants cannot be held liable for aiding and abetting N.J. Transit in retaliating or racially discriminating against Plaintiff. *See, e.g., Failla*, 146 F.3d at 159.[4]

     D.   <u>Punitive Damages</u>

As this Court has determined that Defendants are entitled to summary judgment as to all of Plaintiff's substantive claims, there is no basis for an award of punitive damages. *See, e.g., Krueger Assocs. v. Am. Dist. Tel. Co.*, 247 F.3d 61, 67 (3d Cir. 2001) (observing that "the absence of any viable substantive claim . . . deprives [the plaintiff's] request for punitive damages of any underpinning [claim].") ; *see also Zugarek v. S. Tioga Sch. Dist.*, 214 F. Supp. 2d 468, 482 (M.D. Pa. 2002) ("Given that plaintiff's substantive [§ 1983] claims against defendants will be dismissed, and in light of the fact that a punitive damages claim cannot stand independent of an underlying substantive claim, plaintiff's punitive damages claim will be dismissed.").

**V.   CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.

---

[4] To the extent that Plaintiff argues that DeCola, Parsons, and Tidd aided and abetted each other, as opposed to N.J. Transit, in a "scheme to terminate [Plaintiff's] employment," (*see* Def. Oppn. Br. at 20), that argument fails because nothing in the record suggests that any such scheme existed. Indeed, there is no evidence to suggest that either Parsons or Tidd was aware of Plaintiff's purported complaint to DeCola, or that Parsons or Tidd sought to terminate Plaintiff's employment because of any such complaint or his race. Additionally nothing in the record, aside from Plaintiff's speculation, suggests that DeCola would have sabotaged the 801 machine because of a retaliatory or discriminatory motive. Under § 1981, individual liability requires a showing that a defendant was "personally involved in the discrimination . . . *and intentionally caused* the [employer] to infringe on [the plaintiff's] Section 1981 rights, or . . . authorized, directed, or participated in the alleged discriminatory conduct." *See Al-Khazraji v. Saint Francis College*, 784 F.2d 505, 518 (3d Cir. 1986) (emphasis added). Having determined that there are no facts in the record to suggest that Plaintiff's termination was either a retaliatory act or the product of racial discrimination, this Court sees no basis for sustaining any aiding and abetting claim against the Individual Defendants, even if such a claim were premised on the theory that the Individual Defendants aided and abetted each other.

Plaintiff's claims under the NJLAD, §§ 1981 and 1983, and the CEPA are dismissed with prejudice. An appropriate Order follows.

Dated: _17_ of October, 2013.

JOSÉ L. LINARES
U.S. DISTRICT JUDGE